Robinson, J.,
¶ 43. dissenting. I agree with the majority’s conclusion that the trial court erred in excluding the officer’s testimony regarding what Chad Limoge said to him when Limoge called to report that defendant had committed the crime. But I do not agree that the error was harmless. The State’s evidence was far more equivocal than acknowledged by the majority, and the jury could have assigned more probative value to the excluded evidence than the majority has. Properly applying harmless-error review to the evidence in this case, I cannot join the majority’s conclusion that the trial court’s evidentiary error in this case was harmless.
I. Harmless-Error Review
¶ 44. Harmless-error review requires more searching consideration of the strengths and weaknesses of the State’s case than the majority has undertaken here, and we should be especially cautious in reviewing for harmless error the erroneous exclusion of impeachment evidence undermining the credibility of the State’s key witness or witnesses.
¶ 45. In State v. Carter, this Court considered the harmless error standard in depth. 164 Vt. 545, 552, 674 A.2d 1258, 1263 (1996). We first noted that “[t]he basic premise that errors must have some relation to the outcome of a criminal case, or some independent right of the defendant, before appellate intervention is warranted is stated in both the criminal and evidence rules.” Id. (citing V.R.Cr.P. 52(a); V.R.E. 103(a)). In short, there must be “some relationship between the error and the outcome.” Id. at 552, 674 A.2d at 1264.
¶ 46. Reviewing our harmless-error caselaw, this Court noted that until the late 1960s, it was rare for the Court to affirm a criminal conviction by holding that an error was harmless, and that generally the Court did so only “where there was no possibility that the error could have affected the conviction.” Id. at *481 552-53, 674 A.2d at 1264. More recent cases, on the other hand, were not consistent with respect to the applicable standard, and were difficult to reconcile. Id. Accordingly, the Carter Court sought to clarify the standards for harmless error.
¶ 47. The Court concluded that error, whether characterized as constitutional or nonconstitutional, is harmless “only if the appellate court can state ‘a belief that it was harmless beyond a reasonable doubt.’ ” Id. at 553, 674 A.2d at 1264-65 (quoting Chapman v. California, 386 U.S. 18, 24 (1967)). We noted that this standard is “most consistent with the standard of proof in criminal trials and thus accords the greatest deference to the jury as trier of fact.” Id. at 556, 674 A.2d at 1266. This Court emphasized that “we must approach harmless error arguments cautiously.” Id.
¶ 48. The next leading case involving our harmless error standard is State v. Lipka, 174 Vt. 377, 817 A.2d 27 (2002). In Lipka, the trial court erred by allowing a child witness to testify sitting at a table in front of the jury, with her back to the defendant. In assessing whether the error was harmless, this Court considered whether it could say beyond a reasonable doubt that a jury would have convicted if the child had not testified at all. We identified the “two most important factors in the harm equation” as “the strength of the prosecution’s case without the offending evidence and the strength of the offending evidence.” Id. at 385, 817 A.2d at 34.
¶ 49. We noted that “it is important to understand that it is not the role of this Court to determine whether [a] defendant is guilty,” and quoted Chief Judge Harry Edwards of the U.S. Court of Appeals for the District of Columbia Circuit, who cautioned against the seductiveness of relying on the harmless-error rule where “‘a defendant’s conviction appears well justified by the record.’ ” Id. (quoting H. Edwards, To Err is Human, But Not Always Harmless: When Should Legal Error Be Tolerated?, 70 N.Y.U. L. Rev. 1167, 1170 (1995)). Judge Edwards explained, “[W]e have applied the harmless-error rule to such an extent that it is my impression that my colleagues and I are inclined to invoke it almost automatically where the proof of a defendant’s guilt seems strong.” Edwards, supra, at 1170. Accordingly, the Lipka. Court noted that the issue is not “what we would do if we were the factfinder,” but rather “what the jury might have done without the offending evidence.” 174 Vt. at 385, 817 A.2d at 34.
*482 ¶ 50. In conducting its harmless-error review in Lipka, this Court noted that “[a]t base, this was a classic swearing contest.” Id. Considering the evidence introduced at trial in detail, and the impact of the erroneously allowed testimony, the Court concluded that it could not say beyond a reasonable doubt that the jury would have convicted the defendant had the improperly admitted evidence been excluded. Id. at 389, 817 A.2d at 37.
¶ 51. Since Lipka, this Court has examined a number of cases in which admission of evidence in error was not harmless due, in part, to the central role of a witness’s credibility to the State’s case. For example, in State v. Hazelton, 2006 VT 121, 181 Vt. 118, 915 A.2d 224, a sexual-assault case, the jury heard two competing versions of events, one told through the complainant’s testimony and another told through defendant’s testimony. The case essentially boiled down to a credibility contest. This Court concluded that the trial court erred in permitting prior consistent statements of the complainant introduced through the investigating officer and the complainant’s grandmother. Id. ¶¶ 3-14. In concluding that the error was not harmless, this Court noted:
With credibility being the key ingredient in this swearing contest between complainant and defendant, and absent any independently corroborating evidence of the assault, we cannot avoid a conclusion that it was reasonably possible, as intended, that the erroneously admitted testimony influenced the jury’s decision to believe [the complainant].
Id. ¶ 20. The defendant’s convictions were therefore reversed and remanded. Id. ¶ 22.
¶ 52. Other cases include State v. Groce, 2014 VT 122, ¶ 20, 198 Vt. 74, 111 A.3d 1273 (holding admission of defendant’s friend’s statement regarding friend’s belief that defendant could commit crime not harmless error where “[wjitness statements played a substantial role in supporting the jury verdict, making witness credibility of paramount importance.”); State v. Madigan, 2015 VT 59, ¶ 33, 199 Vt. 211, 122 A.3d 517 (concluding improper admission of testimony concerning witness’s reputation for truthfulness was not harmless where witness’s credibility was critical to State’s case); and State v. Blair, 155 Vt. 271, 276, 583 A.2d 591, 594 (1990) (holding that where credibility of witness was at issue in sexual-assault case, Court could not say “that a third party’s opinion of *483 the credibility of the victim could not have tipped the scales such that [the] defendant would have been acquitted”).
¶ 53. Moreover, in a case more squarely on all fours with this one, we recognized the particular harm of an erroneous ruling that excludes evidence offered by a criminal defendant to impeach an important State witness. In State v. Herring, we explained:
Improper exclusion of evidence to impeach a key prosecution witness is a serious error, implicating fair trial rights under both the United States and Vermont Constitutions. Although our harmless error analysis is generally identical in constitutional and nonconstitutional criminal cases, this Court specifically acknowledged that a trial court’s discretion to restrict the impeachment of a key prosecution witness with evidence reflecting on [the witness’s] credibility is limited by the protection afforded by the Confrontation Clause.
2010 VT 106, ¶ 8, 189 Vt. 211, 19 A.3d 81 (quotations and citations omitted). In considering the trial court’s refusal to allow a defendant to play a video of the complainant’s prior testimony, which the defendant hoped to use to impeach the complainant, this Court noted that “[t]he impact of excluding impeachment evidence is particularly critical where there is no independently incriminating proof beyond a reasonable doubt.” Id. ¶ 10. This Court concluded that although “[i]n the instant case there was evidence tending to corroborate ... the complainant’s testimony,” reversal was nonetheless warranted because this Court could not conclude beyond a reasonable doubt that “the impeachment evidence erroneously excluded would have had no impact on the jury’s credibility assessment in this contested case.” Id. ¶¶ 10-11; see also Dionas v. State, 80 A.3d 1058, 1066 (Md. 2013) (“We have stated frequently that, where ... the jury’s assessment of who is telling the truth is critical, an error affecting the jury’s ability to assess a witness’ credibility is not harmless error.”); State v. Thomas, 308 P.3d 270, 273 (Or. Ct. App. 2013) (concluding that failure to admit relevant impeachment evidence where “evidence was highly probative of the credibility of the witness . . . whose testimony was the foundation of the prosecution’s case” was not harmless error); State v. Pradubsri, 743 S.E.2d 98, 101, 104-06 (S.C. Ct. App. 2013) (holding that trial court’s failure to admit evidence of potential legal exposure of witness not harmless error because witness’s testimony was essential to State’s case).
*484 II. Evidence at Trial
¶ 54. With these standards in mind, I review the evidence in this case more closely, considering evidence supporting the jury’s verdict, as well as evidence that could have supported a contrary verdict.
A. Disinterested Eyewitnesses to the Assault
¶ 55. The stabbing took place around 2:00 a.m. on January 15, 2012 near the intersection of Church and King Streets in Burlington. The State’s first witness was a disinterested observer who was sitting with a friend in her parked car on King Street at the time of the incident. She heard people arguing and saw a black male round the corner from Church Street onto King Street with two white men moving towards him. The black male had his hands up and was backing away from the white males. She heard him say, “I ain’t got your shit.” The black male backed into the middle of the road, and one of the white males leaned in toward the black man, made a quick swiping motion, and then kept going. The black male stumbled toward a police vehicle that rounded the corner and asked the police to call an ambulance. The assailant headed south on Church Street, and his counterpart headed north.
¶ 56. As the witness approached the police car, she heard a different white male tell the police officer that a black man had committed the stabbing and had gone in a different direction. At that point she and her friend spoke up and reported what they saw.
¶ 57. This witness described the assailant who advanced on the victim in the road as a white male with dirty blonde to medium color hair. He was about 5'11" to 6', about 160 to 170 pounds, and was wearing a winter beanie-type hat, a zipper hoodie sweatshirt with a white base and a blue and green plaid square-like pattern above, and jeans. He was in his early to mid-20s, had a broader chin than the other man who pursued the victim with him, and was “kind of scruffy.” Although she initially testified that she could not tell whether he had any facial hair, upon reviewing her prior deposition testimony, she testified that he had a goatee. The witness testified that her memory of the facial features of the assailant would have been pretty good the day after these events, but she was unable to identify defendant as the perpetrator in a photo array that she reviewed the next day. This witness de *485 scribed the second pursuer — the one who did not lunge at the victim — as around 510" with darker hair and scruffy facial hair. He was wearing a burnt orange, rusty-colored pullover hoodie.
¶ 58. The second disinterested witness in the car described the assault in similar terms. She did not get a good look at the assailant, though she confirmed that he was white and thought he was around 6' tall. She initially testified that the man who did the stabbing was wearing a black hoodie, and that his friend had a beanie type winter hat on. Then she acknowledged that in a prior deposition she had actually testified that the assailant was wearing an “army fatigue coat.” And, finally, she testified that in preparing for her trial testimony with the state’s attorney she acknowledged that she may have gotten the information about the army fatigue coat from her friend, and that she really didn’t know what the assailant was wearing. Like her friend, this second witness from the car heard somebody telling the police that two black men had assaulted the victim.
B. Victim
¶ 59. The victim himself testified that after leaving a bar, he passed through a large crowd on Church Street. Two white men approached him and accused him of grabbing or smacking the buttocks of one of their female friends. The victim told the white males “I don’t know what you’re talking about” and kept walking. The two men pursued him, and all three swore at each other as the victim continued walking. At some point, the victim turned around and was skipping backwards while moving down the street facing the two white males. He testified that the taller white male started running towards him. The victim was under the impression that the two were going to fight. He and the taller white male squared up, when the victim felt a punch in his stomach. He knelt down to catch his breath and felt a wetness and saw blood. He yelled “you . . . stabbed me,” and then the two men took off.
¶ 60. The victim testified that the person who stabbed him was one of the two white men who had been following him since he passed through the crowd outside a bar, not a third person who came running and stabbed him. He described the assailant as 6' to 61" tall, but did not otherwise offer identifying descriptions.
C. Shaun Couture
¶ 61. Shaun Couture was one of the white men pursuing the victim. He testified that on January 14, 2012, he went out with his *486 cousin Chad Limoge, Limoge’s girlfriend Jessica Cornell, and another friend, Hannah Yurie. Couture had known each of these people for years. At the bar, the group ran into their friend Jess Sturtevant, who was with Sarah Giles, defendant’s girlfriend,* and defendant. Couture had been introduced to defendant, but did not know his name. At some point during the evening, Couture’s other friend, Eric Hazen, arrived, but Couture testified that Hazen was not really part of the group. Couture testified that he was wearing a camouflage jacket with boots that night and a winter hat, but that he lost the hat while at the bar. He also testified that he was 510" tall.
¶ 62. After the bar closed, the group stepped outside together, intending to get pizza. Couture testified that at that point a black male walked past and grabbed Limoge’s girlfriend’s “backside.” Couture confronted the black male (who turned out to be the victim), and Couture and Limoge and the black male began swearing back and forth. Limoge then took off his jacket and began shadowboxing with the man. Limoge was wearing a white t-shirt with a design on it underneath his jacket. The man then tried to punch Limoge, who ducked, resulting in the man hitting Limoge’s girlfriend instead. The man then took off walking backward, facing Couture and Limoge, who followed him. As the man walked backward, pursued by Couture and Limoge, the three swore at each other. Limoge’s girlfriend called him back and he stopped following the victim, but Couture continued to follow the man, yelling. Couture testified that he rounded a corner, and no one else was with him at the time. Couture engaged in an argument with the man from a distance of a car length, but the argument drew to a conclusion and they were walking their own ways. Then defendant appeared, walked past Couture, and punched the man. Defendant ran away, and Couture likewise bolted.
¶ 63. Couture returned to Church Street. At that point, he did not know that someone had been stabbed. On cross-examination, *487 defense counsel asked Couture if he had told Yurie that there had been a stabbing, to which Couture responded no, because at that time he was unaware that the victim had been stabbed. When police officers arrived and asked Couture what happened down the street, he told them “nothing” and denied seeing anybody run up and punch or stab the victim. While Couture was talking with the officers, Limoge approached them “talking nonsense,” and speaking very loudly. Police approached Limoge to talk to him separately. By that time, Limoge had put his coat back on.
¶ 64. Couture went to the police station where he was questioned for hours. He did not tell the police anything because he did not want to “rat” on anybody. Couture left the police station around five or six in the morning. He was picked up by Limoge, defendant’s girlfriend, and their friend Sturtevant. While they were driving, and loud enough for the women to hear, Limoge admonished Couture to “give the person up” and told him to tell the truth. On cross-examination Couture acknowledged that during this drive Limoge was upset because he thought he was going to get in trouble. Limoge said to Couture, ‘You’re going to get me a name because Pm not going to go to jail” for something Limoge had not done. Couture testified that during this drive he said nothing from which the women could infer that he was implicating defendant and the women said nothing to suggest that defendant had done this.
¶ 65. When they arrived at their destination, after the women stepped out of the car, Couture told Limoge that he knew who had committed the stabbing but he did not know the person’s name. Limoge then told Couture defendant’s first name. Couture was then driven to Limoge’s house, where he and Limoge talked about what had happened and then the two passed out. Couture was with Limoge from the time they left the police station until they went to bed that night.
¶ 66. Later that day, Couture texted Sturtevant to figure out what to do next, and to find out defendant’s last name. Portions of their text messages throughout the day were read into evidence, including a statement from Sturtevant where she wrote, “Hope you’re not mad at me, hope none of you are,” to which Couture responded “Pm not mad, Pm just at your friend’s boyfriend. Pm not going to jail for him.” Sturtevant replied, “I don’t — I know I don’t want you to either. I asked [Limoge and his girlfriend] if [they] could stop by to talk to them tonight *488 because I don’t want you or [Limoge] getting in trouble.” She also directed Couture to a Facebook page where he could find a picture of defendant. That afternoon, she wrote, “I want to help you and [Limoge]. I just can’t be brought in the middle. I can’t lose my LNA, I just got it, you know. But I also don’t want either you in trouble.” Later in the text conversation, Couture told Sturtevant that he was going to be charged with attempted murder if he did not “give him up.” Sturtevant told Couture “Okay. Give him up. I mean he fucked up, not you. ... If you can please keep me out of it, I’ll get you the pic . . . But stay safe.” Thereafter, Couture scheduled a meeting with a police officer to relay the information he had been given.
¶ 67. Couture acknowledged that he barely knew defendant, that he was not aware that defendant had any particular relationship with Limoge’s girlfriend, whom Couture said the black male had struck, and that prior to the moment that he ran up and punched the black man, defendant was not involved in the altercation. He also acknowledged that when the police initially interviewed him, he said that defendant was wearing a white shirt, a blue coat, and a Yankees or Boston baseball cap.
D. Defendant’s Girlfriend
¶ 68. Defendant’s girlfriend testified that after the group left the bar she heard Limoge’s girlfriend shouting that she had been punched. Defendant, Couture, Limoge, Yurie, and Hazen all pursued the man who allegedly touched Limoge’s girlfriend. Defendant’s girlfriend called defendant back, and he returned partway to her, before turning back toward the commotion and leaving. Shortly after that, she called defendant, who by then was at a friend’s apartment nearby, and asked whether she could come to the apartment to sober up and figure out where the other people had gone. She brought Limoge’s girlfriend and Sturtevant with her.
¶ 69. When she told defendant that there were officers swarming downtown Burlington, defendant did not react. Around 8:00 a.m., defendant’s girlfriend, Sturtevant, and Limoge’s girlfriend went to take Limoge’s girlfriend to the police station. Defendant walked his girlfriend back to her car, near the scene of the incident. The police questioned defendant’s girlfriend while she was at the police station. When asked who she was with that evening, she did not name defendant. When asked if she saw anybody run down the street, she did not name defendant.
*489 ¶ 70. She described the car ride from the police station with Couture, Limoge, and Sturtevant. She said that Couture was saying that he knew who had done it and that “they were going to pay for it.” Limoge asked who it was, and Couture wouldn’t say. The men were yelling and Limoge emphasized that he was the one being told that he had done it. At the end of the drive, after Sturtevant, Couture, and Limoge got out of the car, Limoge came to her car door and angrily told her that the guy that she was with was the one who did it and they were going to go after him and to thank him for making Limoge go back to jail. On cross-examination, defense counsel asked: “If Mr. Limoge were to say to the police that on the car ride from the police station . . . he had overheard the girls talking about who had done it and that’s . . . how he learned about who did the stabbing, would that be accurate?” Defendant’s girlfriend replied, “No.”
¶ 71. After Limoge told her that defendant had committed the stabbing, defendant’s girlfriend reached out to defendant on Facebook to communicate about what happened in the early morning hours of January 15, 2012. When she asked defendant about what happened the prior night, he simply responded “[w]e can talk about it later.” Defendant met with his girlfriend later in the day, and at that time defendant confessed to stabbing the victim. He explained that he had been upset because he thought their friend Jess Sturtevant was the one who had been hit in the face. Defendant repeatedly apologized for what he had done. His girlfriend urged him to turn himself in.
¶ 72. Following this exchange, defendant’s girlfriend “defriended” him on Facebook, and he messaged her to ask why. During the ensuing exchange, she responded that he needed to turn himself in. He repeatedly said he didn’t do anything, and asked to speak with her in person. He did not admit through the Facebook conversations to committing the stabbing.
¶ 73. Subsequently, the police contacted defendant’s girlfriend again, and she had another conversation with them. She agreed to wear a body wire and personally talk to defendant, but when she did, defendant repeatedly denied stabbing the victim.
¶ 74. Defendant’s girlfriend testified that Couture was wearing a long sleeve black shirt on the night in question. Although she initially testified that he was wearing a black jacket, upon refreshing her recollection she did not remember what the jacket was. She said Hazen was wearing a black jacket and a black hat *490 on backwards. Defendant was wearing a loose-fitting plaid shirt that she had given him for Christmas over a white undershirt. The plaid shirt was black, grey, white, and turquoise. She testified that defendant is about 6' tall.
E. Hannah Yurie
¶ 75. Hannah Yurie’s memory was blurry. She testified that at the time of the fight she tried to stop Couture from fighting but he pushed her out of the way so he could go fight. Thereafter, she saw Couture come up in a hurry. He reported to her that somebody had gotten stabbed down there, and he had to get out of there. Limoge then came running up and she repeated to Limoge what Couture had said.
¶ 76. During her testimony, Yurie said she saw defendant run down to King Street; she tried to yell to him but his girlfriend said something like, “He’ll be fine.” She acknowledged that when she initially gave a statement to the police immediately after the incident she told the police that she thought the stabber was Limoge and that she did not mention defendant at all that first night. She acknowledged that she did not remember that it was actually defendant and not Limoge that went down the street until a year later when she had to give a deposition in this case.
F. Testimony About Defendant’s After-the-Fact Statements
¶ 77. Around the time of the incident, a friend of defendant’s was at an apartment where defendant was staying, which was within two blocks of the assault. This witness testified that defendant arrived at the apartment in the early morning about an hour after she did, and that he told her he and a couple of other people had confronted a man who had hit a friend in the face. He reported that the man hit him, and was worried that the altercation might jeopardize his probation. This witness testified that she believed that defendant was wearing a blue plaid shirt at the time, although she didn’t remember whether that was because she had actually seen him wearing the shirt or because everyone was talking about a blue plaid shirt. She testified that he was not wearing a zip-up hoodie when he arrived at the house.
¶ 78. Another witness, who was a mother figure to defendant, testified that he had reported to her after the altercation that a fight broke out because a man slapped a woman in the face and the woman’s boyfriend confronted the man. She testified that *491 defendant said that he was one of the people who confronted the man, but that he took off once a fight broke out because he did not want to be picked up for drunk and disorderly conduct because he was about to get off of probation.
G. Testimony of Various Police Officers
¶ 79. Officer Stewart was in the passenger seat of the police cruiser that first encountered the incident scene. As the car traveled southbound on Church Street she saw two males run “with a purpose” across the street from the King Street area heading northeast to the superior court parking lot. Seconds later, the victim flagged the police down. She testified that when the black male approached her vehicle, his hand covered a portion of his abdomen. After telling Officer Stewart “they stabbed me,” the man removed his hand, allowing his internal organs to spill out.
¶ 80. Officer Stewart described the two men she saw running together from the scene moments before encountering the victim. She said they were two white males. She testified that one was wearing hunters orange and white and the other was wearing a hooded sweatshirt or plaid jacket. She recognized the man wearing plaid from a local business establishment and later identified him as Eric Hazen. On cross-examination, she acknowledged that if her communication over the police radio that night described a suspect wearing black, rather than plaid, her memory might be called into question; however, confronted with evidence suggesting that she previously described one of the fleeing suspects as wearing black, she firmly maintained that she recalled that Eric Hazen was one of the fleeing males and was wearing a plaid jacket or hoodie at the time. The State did introduce testimony from a dispatcher who testified that the log generated contemporaneous with officers’ reports reflects that Officer Stewart reported that a suspect was wearing a black jacket.
¶ 81. An officer who responded to the scene moments after the stabbing testified that he saw someone running away from the site of the stabbing in a camouflage jacket. He later identified the person as Shaun Couture. The officer did not see anyone else running away from the scene.
¶ 82. Another officer, Officer Mellis, heard a report that two people were running away from the scene, and encountered two people arguing in a nearby parking lot. One was Couture and the other was Yurie. When the pair saw the officer, Couture started to *492 walk away. After the officer asked Couture what was going on, another male — later identified as Limoge — yelled “Get off my brother” and began approaching them aggressively. Limoge was wearing a black jacket that matched the description of one of the fleeing white males that another investigating officer had given over the radio.
¶ 83. An officer, who spoke with Eric Hazen after the incident, described Hazen as being around 5'8" or 5'9" with short dark hair and a short full beard. Finally, an officer who spoke with Limoge after the incident described Limoge as being 510".
III. Application of Harmless Error
¶ 84. With this evidence in mind, I turn to (1) the strength of the State’s case; and (2) the significance of the excluded evidence.
¶ 85. The above account of the evidence introduced at trial suggests that the State’s case had significant strengths and weaknesses. On the one hand, Couture, who was present at the scene, testified that defendant stabbed the victim; defendant’s girlfriend testified that defendant had confessed to her; and a disinterested witness’s description of the assailant, and most particularly his plaid outerwear, jibes with witness testimony that defendant was wearing plaid at the time of the incident. Defendant was seen running toward the scene of the crime moments before, and, based on his girlfriend’s testimony about the knife in his pocket, had the means to commit a stabbing. The disinterested witness testified that the perpetrator ran south on Church Street after the assault, and defendant is the only one of the group who did not return to the area north of King Street shortly after the attack. This evidence does provide ample support for the jury’s verdict.
¶ 86. On the other hand, defendant was only one of four men potentially implicated by the evidence. Based on the testimony, including his own, Couture was almost certainly one of the two men the disinterested witness saw pursuing the victim. Limoge, Hazen, and defendant were all seen pursuing the victim prior to the stabbing. A police officer testified that Hazen was fleeing the scene with Couture immediately after the stabbing, and evidence that an officer reported a suspect fleeing the scene in a black jacket potentially implicated Limoge, who was seen wearing a black jacket that night.
¶ 87. A disinterested witness said the assailant was wearing a white zip-up hoodie with a plaid design on it, and a beanie-style *493 winter hat. But, although there was evidence that defendant was wearing plaid that night, the disinterested witness did not identify defendant as the perpetrator in a photo array the next day. She was never offered a photo array that included a photo of Hazen, Couture, or Limoge. In addition, defendant’s girlfriend said he was wearing a plaid shirt rather than a zip-up hoodie, and that defendant was wearing a hat that matched his shirt. Moreover, a police officer testified that Hazen, who was fleeing the scene with Couture, was also wearing plaid that night. And, the second witness who watched the scene from inside a car first testified that the perpetrator was wearing a black jacket. There was some testimony that Limoge was wearing black, and some that Hazen was wearing black. That witness subsequently acknowledged that she had previously testified that the perpetrator was wearing camouflage — which Couture was wearing. She ultimately said she did not know what the perpetrator was wearing. The link between the testimony of the disinterested eyewitnesses and defendant’s guilt is vulnerable to challenge on many levels.
¶ 88. Couture testified that defendant was the perpetrator, but his description of how events unfolded was at odds with that of the disinterested witness and the victim. The victim and the primary disinterested witness testified that the perpetrator was one of the two men who had been steadily pursuing the victim — an account at odds with Couture’s testimony that he and Limoge had pursued the victim, and then Limoge dropped back and defendant appeared at the last moment and punched the victim. Moreover, Couture had a strong incentive to tell a story that exonerated him and did not implicate his cousin, Limoge, or his friend, Hazen. In addition, Couture himself admitted to lying to the police when they initially interviewed him at the scene and at the police station. And Yurie’s testimony that Couture told her someone had been stabbed immediately after the incident undermines Couture’s claim that he did not even realize that a stabbing had occurred until the police told him.
¶ 89. Finally, defendant’s girlfriend’s testimony that defendant had confessed to her was damning, but she was unable to get defendant to acknowledge his confession in writing or in person when she was wearing a wire.
¶ 90. There was no physical evidence, recorded confession, or conclusive video recording in the case. The police did not recover a weapon (other than a knife they found on Limoge, which was *494 not linked to the crime by blood or DNA). Instead, this case turned entirely on the credibility of the various witnesses. Their accounts were substantially incongruent. Moreover, none of the witnesses implicated defendant in their initial police interviews. Defendant was only implicated after the others in the social group had a chance to confer with one another. The record reflects extensive contact and communication among the various witnesses after their initial police interviews corresponding to a developing collective sentiment that defendant, and not the others, should be held accountable for the stabbing. The friendship and familial bonds between Couture on the one hand and Hazen and Limoge on the other, contrasted with their unfamiliarity with defendant, suggested a motive to pin the blame on defendant.
¶ 91. In light of the above, the State clearly had sufficient evidence to get to the jury, but this was anything but an open-and-shut case. The weaknesses in the State’s case were substantial, and an acquittal would not have been at all surprising. Given this, it would be hard to conclude beyond a reasonable doubt that additional evidence undermining the State’s case would not have made a difference.
¶ 92. Against this backdrop, though the excluded evidence may have been only marginally impactful, it would have reasonably supported defendant’s theory of the case. Officer Mellis testified that after Limoge, Couture, and Yurie left the police station, he received a phone call from Limoge. The substance of this conversation was the errantly excluded testimony. Defense counsel proffered that Officer Mellis would testify that Limoge claimed to have overheard defendant’s girlfriend and Sturtevant talking in the car, and implicating defendant in the stabbing. However, Couture had already testified that during the drive with Limoge, Sturtevant, and defendant’s girlfriend, Couture did not disclose that defendant had committed the crime. Defendant’s girlfriend had testified that the first inkling she got that defendant was involved in the crime was after the drive when Limoge told her that it was defendant. The excluded testimony arguably suggested that shortly after the various group members completed their police interviews, they conferred with one another, and Limoge called the police and told a bald lie in the process of implicating defendant for the first time. This evidence could have reinforced the defense theory that the plan to implicate defendant was concocted by the group of friends and orchestrated by Limoge, after they gave their initial interviews to the police.
*495 ¶ 93. The majority rightly points out that defense counsel set up this theory, including highlighting Limoge’s untruthfulness when he called the police to identify defendant as the assailant, in the opening argument, and in cross-examining Couture and defendant’s girlfriend. But without the excluded testimony to actually close the loop from the opening statement and cross-examination, establishing as a matter of evidence that Limoge was untruthful in his initial report to the police, the opening statement and cross-examination were, at best, loose ends that were never tied up by actual evidence.
¶ 94. The force of this potential evidence is not strong; Limoge himself did not testify, so he offered no testimony to be impeached. But the evidence indirectly impeached Couture, defendant’s girlfriend, and arguably Yurie in that Limoge’s lie potentially reinforced the defense theory that the entire group collaborated to implicate defendant. It’s a theory that is bolstered by other evidence — including evidence that none of the witnesses implicated defendant in their initial interviews, Yurie did not recall that it was defendant and not Limoge who went after the victim until a year later, and defendant was a social outsider to the rest of the group.
¶ 95. In the context of a case with significant weaknesses that depends almost entirely on the credibility of the very witnesses whose testimony the defense sought to impeach, I cannot conclude beyond a reasonable doubt that the erroneously excluded testimony would not have impacted the jury’s verdict.
¶ 96. I am hereby authorized to state that Justice Skoglund joins this dissent.

 Giles testified that she and defendant had broken up a few weeks earlier, that they had agreed to hang out on the evening in question, that this was the first time they had seen each other since they had broken up, and that there were romantic feelings between them that evening. For ease of reference, I describe her as defendant’s “girlfriend,” although I acknowledge that this moniker may not be entirely accurate, and that this inaccuracy may be relevant to this witness’s motives.