2007 VT 11

**In re G.F., G.F. & J.F., Juveniles**

[923 A.2d 578]

No. 06-399

¶ 1. February 23, 2007. Mother and father separately appeal from a judgment of the Orleans Family Court terminating their residual parental rights to minors G.F., G.F., and J.F. Mother contends the court improperly failed to: (1) make a finding required by the Indian Child Welfare Act; and (2) explore alternative disposition options to termination. Father joins in mother's second claim, and also asserts that the court erroneously denied his request for appointment of counsel. We affirm.

¶ 2. The facts and procedural background may be briefly summarized. Additional facts will be set forth in the discussion which follows. The children in this case, age eleven, nine, and eight at the time of these proceedings, came into the custody of the Department for Children and Families (DCF) on an emergency basis in January 2005, when the police responded to a report that the children were locked outside their home. Mother was home at the time and admitted to smoking marijuana. The children were placed in a foster home, where they have since remained.

¶ 3. Mother had been granted sole custody of the children under a 2001 judgment of divorce from father. Father's relationship with mother began when she was twelve, and father physically abused her throughout their relationship. After the divorce, father was frequently out of state, avoiding Vermont arrest warrants. His limited contact with DCF providers and the family has been marked by hostility and aggression.

¶ 4. The family had been receiving services from DCF and other community support agencies since 2001. Between 2001 and 2005, however, mother moved frequently between Vermont and New Hampshire, making it difficult to sustain services or keep track of the family. During this period, DCF received numerous reports that mother was leaving the children alone and unattended, was abusing alcohol and marijuana, and was the victim of domestic violence by a number of domestic partners.

¶ 5. Mother stipulated to an adjudication of CHINS in March 2005, and stipulated to a disposition order the following month. The caseplan identified reunification as the goal and called for a variety of services, including substance abuse counseling, family therapy, and parent education. Although notified of the hearing, father did not appear at the detention hearing in January 2005, and also failed to appear at the subsequent CHINS and disposition hearings. The caseplan called for father to participate in parenting classes, domestic violence education, substance abuse counseling, and individual therapy, but did not consider father as a placement option in view of his continued absence from the children's lives.

¶ 6. In December 2005, DCF filed termination of parental rights (TPR) petitions as to all three children based on the parents' failure to progress under the caseplan. The court became aware early in the proceedings that the children, through mother, might be eligible for membership in the Choctaw Nation of Oklahoma (Tribe) and ordered that the Tribe be provided with all hearing notices in the case. The Tribe officially recognized mother and the children as members in February 2006. The Tribe

did not, however, seek to intervene and failed to appear or participate in any of these proceedings. A three-day TPR hearing was held in April 2006 and continued for a final one-day hearing in August. In the interim, at the request of the children, the court issued a ruling that the Indian Child Welfare Act, 25 U.S.C. §§ 1901-1963 (ICWA), applied to the proceedings, but that the Tribe had consciously waived its right to intervene or appear. The court further found that mother and the children had not had any contact with the Tribe or Indian culture, and that she and father opposed any placement of the children with the Tribe.

¶ 7. In late August 2006, the court issued a written decision concluding that there had been a substantial change of circumstances in light of both parents' failure to progress under the caseplan, and further concluding that termination of parental rights was in the best interests of the children. The court found that all of the children had suffered from neglect while in mother's custody; that as a result the children had suffered emotional anxiety and physical distress; that mother had consistently abused marijuana, prescription drugs, and alcohol, and had failed to make any real progress in substance abuse counseling or parenting classes; and that there was no likelihood that mother could resume her parental responsibilities within a reasonable time. The court also found that the children had made substantial progress in foster care, where they were fully integrated into a stable, loving home. As to father, the court found that he had only sporadic contact with the children since the divorce; that he had made no significant progress in parenting education or anger management counseling, indeed that he remained subject to angry outbursts and impulses; and that he could not resume parenting responsibilities within a reasonable period of time. Ac-

cordingly, the court granted the TPR petitions.

¶ 8. The State filed a post-judgment motion for additional findings under the ICWA. The State noted that despite the court's finding that the Tribe had waived its right to intervene or appear, the ICWA continued to apply and required a finding under § 1912(f), which provides:

> No termination of parental rights may be ordered in such [termination] proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

25 U.S.C. § 1912(f). The court denied the motion. This appeal followed.

¶ 9. Mother first contends the court improperly failed to make the requisite "determination, supported by evidence beyond a reasonable doubt," that her continued custody was "likely to result in serious emotional or physical damage to the child," as required by § 1912(f) of the ICWA.* As we have elsewhere explained, Congress enacted the ICWA in 1978 to "'protect the best interests of Indian children and to promote the stability and security of Indian tribes and families.'" *In re M.C.P.*, 153 Vt. 275, 282, 571 A.2d 627, 631 (1989) (quoting 25 U.S.C. § 1902). Congress achieved these goals by establishing "minimum Federal standards for the removal of Indian children from their families and the placement of

---

* Mother does not claim that the evidence failed to include the requisite "testimony of qualified expert witnesses" required by § 1912(f).

such children in foster or adoptive homes which will reflect the unique values of Indian culture." 25 U.S.C. § 1902. The ICWA provides that when the court has reason to know that an Indian child is involved in a juvenile court proceeding, it must notify the child's tribe and afford it the opportunity to exercise jurisdiction or intervene. *Id.* §§ 1911(b), 1912(a). In those cases where the proceeding remains in state court, the ICWA sets out standards which must be met before a child can be placed in foster care and before the parent's rights can be terminated, including the provision at issue here, § 1912(f).

¶ 10. As noted, mother's contention is based solely on the trial court's failure to comply with the statutory finding requirement; she does not claim that the record evidence would fail to support such a finding, had the court chosen to address the issue. The State, in response, does not dispute that, notwithstanding the Tribe's apparent indifference to the outcome in this case, the ICWA remained applicable; indeed, the State acknowledged as much in its post-judgment motion seeking an express finding under § 1912(f). The State asserts, rather, that the trial court "substantially complied" with the statutory requirement through its other undisputed findings — based on extensive evidentiary support — that reunification with mother would be detrimental to the mental health and physical well-being of the children.

¶ 11. Although the court acknowledged in its preliminary ruling that the ICWA applied, it made no reference there or in its subsequent termination ruling to § 1912(f) or to the requirement of a determination, supported by evidence beyond a reasonable doubt, that the children would suffer physical or emotional harm if returned to mother. Accordingly, it is difficult to conclude that the court was aware of the statutory requirement

and intended to address it, albeit implicitly through its other findings rather than by express reference to the statute or the statutory language. The cases on which the State relies show that the ICWA "does not require that a state court specifically cite the beyond-a-reasonable-doubt standard of proof" set forth in § 1912(f), *In re M.R.G.*, 97 P.3d 1085, 1087 (Mont. 2004), but also suggest that the court's findings should "demonstrate an understanding, on the part of the [trial court], that the State satisfied its burden of proof." *In re M.D.M*, 59 P.3d 1142, 1146 (Mont. 2002). Such an understanding by the court of its obligation under § 1912(f) is not apparent from its decision here. Indeed, the State's motion gave the court the opportunity to make that clarification, but the court denied it without explanation. We are therefore unable to conclude that the court substantially complied with the statutory requirement.

¶ 12. Nevertheless, other states have concluded that errors of this nature under the ICWA may be deemed harmless; that a determination of harmless error "is dependent upon [the] particular facts and circumstances" of each case, *In re Enrique P.*, 709 N.W.2d 676, 689 (Neb. Ct. App. 2006); and that it is "appropriate to consult the policies underlying ICWA" in evaluating such claims. *In re J.J.G.*, 83 P.3d 1264, 1268 (Kan. Ct. App. 2004). In *Enrique P.*, for example, the trial court failed to make required findings under § 1912(d) and (e) of ICWA, which condition the placement of an Indian child in foster care on a finding that active remedial efforts have been made to prevent the breakup of the family and a determination, based on clear and convincing evidence, that returning the child to his or her family would likely result in emotional or physical harm. Based on a thorough review of the record evidence, the Nebraska Court of Appeals concluded that "any error related to the juvenile

court's failure to specifically state the foregoing was harmless error in that the evidence would have supported these ICWA findings." *Enrique P.*, 709 N.W.2d at 690.

¶ 13. *In re Riva M.*, 286 Cal. Rptr. 592 (Ct. App. 1991), like the case at bar, concerned the trial court's failure to make the requisite finding under § 1912(f) in support of a termination of parental rights. The Court of Appeal there concluded, however, that the error "was harmless" where the record "evidence was overwhelming" that continued custody in the parent would have been severely detrimental to the physical and mental health of the children and thus "support[ed] the requisite findings beyond a reasonable doubt." *Id.* at 597-98. In further support of its conclusion, the California court held that the fundamental purpose of the Act — to preserve Indian families and culture — would not be infringed where neither the tribe nor the Indian parent desired custody. As the court explained: "We are not aware of any case finding a prejudicial failure to apply the ICWA where the appellant's position, if adopted, would not maintain some contact between the Indian child and the Indian culture." *Id.* at 598 n.10.

¶ 14. We agree that the failure explicitly to make the finding required by § 1912(f) under the required standard of proof can be harmless error depending on the evidence before the court. We must, however, decide what harmless error standard to use in this instance.

¶ 15. Our harmless error standard for CHINS and termination of parental rights cases has been quite liberal. For example, where a finding of fact that supports the conclusion of the court is clearly erroneous, we find harmless error if other valid findings also support the court's conclusion. See *In re T.R.*, 163 Vt. 596, 597, 653 A.2d 777, 779 (1994) (mem.). In *In re T.E.*, 155 Vt. 172, 176, 582 A.2d

160, 162 (1990), the mother of a CHINS child appealed the denial of a motion to modify a termination of parental rights order, arguing that the court improperly required her to show changed circumstances by clear and convincing evidence. We agreed that the standard was improper, but found that any error was harmless because there was nothing in the record that suggested that mother could have met the lesser, appropriate standard of a preponderance of the evidence. *Id.* While *T.E.* is probably the closest of our cases to the issue before us, it offers little guidance. Thus, we treat the issue as undecided and decide it for the first time.

¶ 16. In *State v. Carter*, 164 Vt. 545, 554-55, 674 A.2d 1258, 1265 (1996), we established the harmless error standard for nonconstitutional errors as "harmless beyond a reasonable doubt." We had a number of reasons for doing so, including that the United States Supreme Court had adopted that standard for errors of constitutional magnitude, but a main one was that it "is most consistent with the standard of proof in criminal trials and thus accords the greatest deference to the jury as trier of fact." *Id.* at 556, 674 A.2d at 1266. We also noted that standard was in wide use, "and we have used it frequently," and that it "is most consistent with careful and prudent use of harmless error." *Id.* at 556-57, 674 A.2d at 1266. The same reasons apply here, particularly where the fact-finder must apply a "beyond a reasonable doubt standard" as § 1912(f) requires. We think a "harmless beyond a reasonable doubt" review standard best implements the congressional purpose of keeping Indian families together whenever possible. Thus, we adopt it for harmless error analysis with respect to the requirements of § 1912(f).

¶ 17. Assessed in light of this standard and the record evidence, we are per-

suaded that the error here was harmless. As the trial court found, quoting DCF, the overall evidentiary record portrayed the children's home circumstances as "a cyclical pattern of chaos and insecurity." Throughout the children's lives, mother was subjected to repeated physical abuse by father and subsequent domestic partners. She was, and remained, dependent on marijuana and prescription drugs and repeatedly abused alcohol. In these circumstances, the children suffered from chronic neglect, being left alone and unattended while mother slept or was away. Mother failed to prepare the children for school or to provide medical care or other support. The oldest child, age eleven at the time of these proceedings, was compelled to assume responsibility for her younger siblings, resulting — according to her therapist — in a high level of stress and anxiety. She also showed signs of post-traumatic stress disorder, having witnessed extensive domestic violence. The stress affected the younger children in other ways, including self-inflicted harm and bed-wetting. The therapist further testified, and the court found, that although the children love their mother, they feared for their own safety in her care, and were fearful of being returned to her custody. It was the therapist's considered judgment that a return to mother's custody would be emotionally traumatic to the children.

¶ 18. The court further found that, despite the provision of numerous services and some minimal improvement, mother had continued to heavily abuse marijuana and alcohol; failed to progress in substance abuse counseling; shown no ability to retain or apply the parenting skills taught in the Effective Parenting course, and failed to obtain stable housing or employment. Indeed, mother acknowledged that she was unsure of her ability to take custody of the children at the time of the hearing or in the future, and

was barely able to meet her own needs, much less those of children. In light of these findings, the court concluded that there was no possibility that mother could resume her parental responsibilities within a reasonable period of time, and that termination of her parental rights was in the best interests of the children.

¶ 19. Like the courts in *Riva M.* and *Enrique P.*, we are persuaded that the record evidence in this case overwhelmingly supported the requisite finding of detriment under the proof-beyond-a-reasonable-doubt standard of § 1912, and that the trial court would have so concluded had it addressed the issue. Thus, we can say that the absence of a § 1912(f) finding was harmless beyond a reasonable doubt. Furthermore, although the Indian parent here — mother — unlike the Indian parent in *Riva M.*, expressed a desire for custody of the child, she made no claim, and offered no evidence, of any existing or potential future relationship between herself or the child and the Tribe of which they had recently become members. As the court here explained: "It is factually undisputed that neither the mother nor the children have ever lived on the tribal reservation, nor had any familial, cultural or even casual contact with the Tribe. None of them have ever even visited the Choctaw reservation. The children have had no exposure to their Native culture . . . . "

¶ 20. Mother's second claim (joined by father) requires no extended discussion. She contends that, having concluded that she was unfit to exercise her parental responsibilities and that the best interests of the children supported placing them in the custody of the State, the court was thereby obligated to consider options short of termination, such as longterm foster care. She relies, in this regard, on testimony by the children's therapist that maintaining some contact

with mother would be beneficial to the children. We have repeatedly rejected the claim, however, that the court must consider less drastic alternatives to termination once it has determined the parent to be unfit and unable to resume his or her parental responsibilities. See, e.g., *In re T.T.*, 2005 VT 30, ¶ 7, 178 Vt. 496, 872 A.2d 234 (mem.) (having concluded that the best interests of the child required state custody, court need not "explain why it is choosing termination of parental rights over options" such as guardianship); *In re L.A.*, 154 Vt. 147, 155, 574 A.2d 782, 786 (1990) ("Once the court makes such a finding [of unfitness], it is not necessary for the court to state its reasons for rejecting any less restrictive alternatives."). Accordingly, we find no error.

¶ 21. In his separate appeal, father contends the court erred in denying his requests for appointment of counsel. As the court here found, father was absent from the state during much of 2003 to 2005 because of outstanding arrest warrants. Father was informed of the scheduled juvenile detention hearing of January 24, 2005, and of his right to counsel, but failed to appear. The record reveals that the court ordered that diligent efforts be made to locate father, but he again failed to appear at the merits hearing in March 2005, or the disposition hearing in April 2005, and consequently was not a party to the stipulated adjudication of CHINS and stipulated disposition report. The caseplan called for a number of services to be provided father, but did not consider him to be a placement option in view of his near total absence as a figure in the children's lives.

¶ 22. Father ultimately appeared in June 2005. On June 8, he attended a hearing before a child support magistrate on a motion by the Office of Child Support to establish a child support order against him. He stated in the hearing that although he had a job in Pennsylvania, he was in Vermont to respond to the criminal charges and "I'm here to get custody of my children, too, while I'm here." He signed and filed an application for a public defender on that day, stating only that "I am unemployed right now, have been for a month — and would like to lower the fee." He did not specify the purpose of assigning counsel, and on June 20 the family court judge denied the request on the application stating as grounds: "case is post-Dispo, now on for child support only." Father filed a motion to reconsider stating in writing that "[t]he reason I applied for a public defender was to get custody of my children back from the State." The court denied the motion to reconsider in a brief order: "Assistance of counsel [is] not required for Father to cooperate with DCF and follow [the] plan for necessary services which are required before unification with either parent might be considered." Following the filing of the State's TPR petition in December 2005, the court granted father's renewed motion for appointment of counsel.

¶ 23. Father contends the court violated his federal and state constitutional rights to due process and equal protection by denying his initial requests for counsel. We decline to consider those arguments on this record. As the facts specify, father gave no ground for appointment of counsel beyond the bare assertion that he wanted custody of his children. The disposition order had recently been issued against him by default when he intentionally failed to appear to avoid criminal prosecution. He offered no grounds for reopening the disposition order, and none appear in the record. Recognizing that the grounds stated by father were wholly inadequate, appellate counsel has changed them on appeal arguing not that counsel could have been important to father regaining custody,

but instead that counsel was important to avoid termination of father's parental rights:

> Father had a strong interest in challenging DCF's power to shape the historical events such that they would not form the basis for terminating his parental rights, and he needed the assistance of counsel to do that. Counsel could have made a determinative difference for father as there were complex legal matters involved before the petition to terminate was filed.

All of that might be correct, but these were not the grounds stated to the family court, and we therefore decline to consider it. *In re A.G.*, 2004 VT 125, ¶ 25, 178 Vt. 7, 868 A.2d 692. Moreover, there was no assertion of a constitutional right in the family court.

¶ 24. We emphasize that the situation here goes beyond a technical failure to preserve by an unrepresented litigant. The governing statute authorizes appointment of counsel "when the court deems the interests of justice require representation." 13 V.S.A. § 5232(3). There was no way on this record that the family court could make an informed decision that the interests of justice required counsel. Similarly, in his constitutional arguments, father relies heavily on *Lassiter v. Department of Social Services*, 452 U.S. 18, 26-27 (1981), which holds that the constitutional right to counsel in parental termination proceedings must be determined on a case-by-case application of the three relevant factors identified by the U.S. Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976): the private interests at stake, the governmental interest, and the risk that the procedures will lead to erroneous decisions. The court was not in a position to balance the interests. When father subsequently faced termination of

his rights, counsel was appointed. There was no error.

*Affirmed.*

Motion for reargument denied April 9, 2007.