*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2012-323

FEBURARY TERM, 2013

| | |
|---|---|
| In re S.M., Juvenile | } APPEALED FROM: |
| | } |
| | } Superior Court, Chittenden Unit, |
| | } Family Division |
| | } |
| | } DOCKET NO. 379-10-08 Cnjv |

Trial Judge: Edward J. Cashman

In the above-entitled cause, the Clerk will enter:

Father appeals from the termination of his parental rights in S.M. We affirm.

The record shows the following history. S.M. was born in July 1998. She was taken into the custody of the Department for Children and Families (DCF) in 2008 after telling a school guidance counselor that her stepfather was sexually abusing her. S.M. was adjudicated as a child in need of care or supervision in January 2009. In October 2011, mother indicated to the court that father was S.M.'s biological parent. Genetic testing confirmed this, and father was added as a party. Father played no direct or indirect caretaking role in S.M.'s life. He saw S.M. twice in her life, once shortly after her birth and once many years later at a DNA testing session. Mother voluntarily relinquished her parental rights and following a hearing, the court terminated father's rights.

The court found as follows. S.M. has a long history of sexualized behavior consistent with being sexually abused. She exhibited severe developmental delays throughout her life and expressed herself with violence at school. A doctor who examined S.M. opined that she had lengthy exposure to an unhealthy and unstable family setting that included sexual and physical abuse among family members. Despite her chronological age of fourteen, S.M. had the emotional and intellectual skills of a first grader. The court found that S.M. had shown improvement in her foster home. She also received significant assistance from numerous school professionals at her new school. The court found that any success that S.M. had gained came from the coordinated efforts of her caseworker, foster family, school-based clinician, an educational surrogate, a school social worker, and a special educator. Given S.M.'s numerous needs, the court found that she needed a primary caretaker who understood the challenges she faced and could provide sustained cooperation with a treatment team that included a social worker, school officials, and other health care providers.

As noted above, father had essentially no contact with S.M. nor did he meaningfully participate in the DCF proceedings. Father was aware shortly after S.M.'s birth that mother claimed he was the child's father. Father ignored the court's advice at the time to pursue DNA testing, and otherwise ignored the child. Father stated that he thought mother was doing fine with S.M. and "walked away" from the situation. The court noted that father also abandoned another child from a different relationship.

Father admitted that he knew nothing about S.M. He had no sense of her present needs, her medical, physical, and emotional history, her current siblings and friends, her progress in school, or

even her grade level. He mistakenly believed that she suffered from epilepsy. Father was unconcerned about removing S.M. from her foster family and her foster siblings. Father asserted that mother, S.M.'s foster parents, and the case worker had brainwashed the child. Father did not explain what he meant by that term or what facts supported his claim.

The court noted that father also appeared to be physically unable to care for S.M. Father had heart disease, high blood pressure, and diabetes. Additionally, father's wife provided the primary care for three small children, including a newborn. Father was not clear whether his wife would be willing to care for an additional child, and he had given no thought to how these children would react to S.M.'s presence. Father admitted that left to his own skills and abilities he would be unable to care for S.M.

Based on these and other findings, the court agreed with DCF that father had abandoned S.M. shortly after her birth and that he lacked the skills necessary to parent her. The facts of abandonment were uncontested. Father provided no emotional, financial, or other support for S.M. He took no action regarding the child, other than opposing the termination of his residual parental rights. He had not participated in the DCF proceedings. He sought out no information from S.M.'s caseworker, treatment providers, or school authorities.

The court also found that father presented no favorable evidence under any of the statutory best-interests factors. He had no relationship with S.M. and no understanding of her special needs or behavior problems. S.M. had adjusted favorably to her living situation with her foster family. Father was unaware of the child's progress with her foster family, yet would remove her from this setting to an uncertain placement within his own home. The court found it clear from the evidence that father lacked an adequate understanding of how and if the child would fit into his home, or who would care for her. S.M. was loved and wanted in the foster setting. She was making progress there, was happy, and wanted to stay. The court found that father had not accepted responsibility for the care of his children, and he had abandoned two children. He had no observable skill or experience with child rearing. Father suffered from debilitating health issues that would seem to prevent his providing anything beyond the most superficial supervision of another caretaker's efforts to struggle with S.M.'s many needs. He demonstrated no insight into the depth and variety of S.M.'s needs. He proffered no current capacity, or future means by which to gain the skills and motivation needed, to effectively address those needs. Father played no constructive role in the child's life. The court thus concluded that termination of father's rights served S.M.'s best interests. Father appealed.

As we have often repeated, the superior court "may terminate parental rights only when it finds by clear and convincing evidence that to do so is in the best interests of the child as determined by consideration of four statutory factors." In re J.B., 167 Vt. 637, 639 (1998) (mem.); see 33 V.S.A. § 5114. The most important factor in the court's best-interests analysis "is the likelihood that the parent will be able to resume parental duties within a reasonable time." In re J.B., 167 Vt. at 639. As long as the court applied the proper standard, we will not disturb its findings on appeal unless they are clearly erroneous; we will affirm its conclusions if they are supported by the findings. In re G.S., 153 Vt. 651, 652 (1990) (mem.).

Father first argues that the court erred by treating abandonment per se as an independent ground for termination of parental rights. We need not address this issue because the record shows that the court applied the statutory best-interests factors and its conclusion that termination of father's rights is in S.M.'s best interests is amply supported by the record. As father acknowledges, the uncontested evidence that father abandoned S.M. was certainly relevant to this analysis.

Father next argues that the court's conclusion that he lacked parenting skills is based in material part on clearly erroneous findings. According to father, the court speculated in finding that he

2

appeared physically unable to care for S.M., and it erred in finding that he had not accepted responsibility for the care of his children and had no observable skill or experience with child rearing. Father also states that his wife wanted S.M. to join their family, contrary to the court's finding that he was unclear on this issue. Finally, father argues that the court erred in finding him unconcerned about removing S.M. from her foster home. Father maintains he thought it would beneficial for S.M. to live with her biological siblings and that his "brainwashing" comment was based on his own experience in DCF custody.

Even assuming arguendo that the findings above were clearly erroneous, they would not undermine the court's well-supported conclusion that termination of father's rights was in S.M.'s best interests. See In re G.F., 2007 VT 11, ¶ 15, 181 Vt. 593 (mem.) (explaining that superior court's decision will be upheld, despite clearly erroneous findings, if other valid findings also support court's conclusion). As set forth above, father played no role whatsoever in S.M.'s life and none of the statutory best-interest factors weighed in his favor.

In any event, with one exception, the findings challenged by father are supported by the record. The court could reasonably infer, based on the evidence presented, that father's health issues might have an impact on his physical ability to care for S.M. The court's statement that father did not accept responsibility for his children is supported by the uncontested fact that father abandoned two of his natural children. Father's testimony that the three children who currently live with him are "doing great" does not demonstrate that he has the skills and experience necessary to parent S.M.

Additionally, while father testified that his wife wanted S.M. to live with them, it does not necessarily follow that she would be willing (or able) to care for S.M. But even if the court did err in finding it unclear whether father's wife was willing to care for S.M., the error is harmless as the court's decision in no way turned on this finding. See In re B.M., 165 Vt. 194, 205 (1996) (Supreme Court will not reverse superior court's decision even if one or more finding is erroneous as long as findings are not material to court's decision).

Finally, the evidence supports the court's finding that father was unconcerned about removing S.M. from her foster home. Regardless of the context of the brainwashing comment or father's belief that it would be beneficial for S.M. to live with her biological siblings, the record shows that father appeared to have no understanding of the impact that such removal would have on S.M. We find no grounds to disturb the court's conclusion that termination of father's rights was in S.M.'s best interests.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
John A. Dooley, Associate Justice

_____
Brian L. Burgess, Associate Justice