VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org

Case No.      23-AP-066

*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant. Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

AUGUST TERM,   2023

| | |
|---|---|
| In re S.H., E.H., A.B., Juveniles<br>(N.B., Mother\* & W.H., Father\*) | APPEALED FROM:<br><br>Superior Court, Bennington Unit,<br>Family Division<br>CASE NOS. 21-JV-00081; 21-JV-00082;<br>          21-JV-00754<br>Trial Judge: Howard A. Kalfus |

In the above-entitled cause, the Clerk will enter:

Parents appeal the termination of their parental rights to daughters A.B., E.H., and S.H., who are fifteen, thirteen, and twelve years old, respectively.[*] We affirm.

In January 2021, the State filed petitions alleging that E.H. and S.H., who were then in elementary school, were children in need of care or supervision (CHINS) due to lack of proper parental care. According to the affidavits filed in support of the petitions, S.H. had fifty-three absences from school during the 2020-2021 year, thirty-nine of which were unexcused. E.H. had forty-three absences, twenty-nine of which were unexcused. At the time, S.H. and E.H. were enrolled in remote learning due to the coronavirus pandemic.

In March 2021, the court issued a conditional custody order (CCO) to mother, which required her to ensure that the children attended school and to sign a release allowing the Department for Children and Families (DCF) to communicate with school staff. In May 2021, the State moved to vacate the CCO because the children were still not attending school and mother avoided DCF and police when they tried to contact her or visit the home. The court vacated the CCO and issued a temporary care order transferring custody to DCF.

---

[*] A.B.'s father is deceased. Appellant W.H. is the father of E.H. and S.H. At the time these cases were filed, W.H.'s parentage was not yet established. W.H. and mother stipulated to his parentage of E.H. and S.H. in September 2021. We use the term "father" here to refer to W.H. and "parents" to reference W.H. and mother.

When DCF staff went to pick up the children, father attempted to prevent them from doing so, and was arrested for obstruction of justice. Mother was simultaneously arrested on an outstanding warrant. The children reported to DCF staff that parents appeared to be abusing drugs in the home and that father drank to excess. In June 2021, mother admitted that E.H. and S.H. were without proper parental care due to their poor school attendance.

Later that month, the State filed a petition alleging that A.B. was CHINS because she had missed eighty-three days of middle school that year and due to concerns about safety in the home. The court transferred custody of A.B. to DCF in an emergency care order, noting in addition to A.B.'s truancy that mother had refused to cooperate on a safety plan for A.B. and that E.H. and S.H. had reported facts indicating that parents were actively using drugs in the home. In September 2021, mother stipulated that A.B. was without proper parental care based on these allegations. The children were all placed with the same foster family, in whose care they remained at the time of the final hearing.

The court issued disposition orders continuing DCF custody, with goals for E.H. and S.H. of reunification with mother or father by March 2022 and, for A.B., reunification with mother by April 2022. The associated case plans called for both parents to engage in mental health and substance abuse treatment, maintain sobriety, undergo random urinalyses as requested by DCF, sign releases and cooperate with DCF, maintain safe and stable housing, follow conditions set by the criminal court, and appear sober and on time for all visits.

In June 2022, DCF petitioned to terminate parental rights. At the conclusion of a two-day hearing in January 2023, the court made the following oral findings. Father completed mental health and substance abuse evaluations as required by the case plans. It was recommended that he undergo treatment to address anxiety and depression, but he did not do so. He had been engaged with a substance abuse treatment provider for several years. He signed a release for that provider to communicate with DCF, but revoked it in December 2022. Mother refused to participate in any evaluations because she had undergone two evaluations in the previous six years. However, she did not provide those evaluations to DCF, so DCF could not determine what, if any, recommendations were made. Mother did sign a release for her substance abuse provider. While the case was pending, both parents tested positive for unprescribed illicit substances on multiple occasions. Mother complied with only one of DCF's three requests to provide random urinalysis.

Both parents acknowledged that they did not have a home suitable for the children at the time of the hearing. DCF attempted to help parents find adequate housing for themselves and the children, but parents did not take sufficient steps to do so.

Father attended all visits with the children. Three visits were cut short because he was unable to control his anger. Mother missed numerous visits and went for weeks at a time without seeing the children. For A.B.'s fourteenth birthday, mother gave the child vape pens, marijuana, and a self-tattoo kit.

The court found that circumstances had sufficiently changed to justify modifying the existing disposition orders because parents had stagnated in their progress toward the case plan

goals. It noted that parents saw the children for two forty-five-minute visits each week, which was less visitation time than they had at the outset of the case.

The court then assessed the statutory best-interests factors. It found that the children had a strong and loving bond with their parents but had also formed loving bonds with their foster parents, who were meeting their needs and ensuring that the children had contact with their extended family. The children were well-adjusted to their home and community and were thriving in school. The court found that parents were unable to resume parenting within a reasonable time due to their uncertain progress in mental health and substance abuse treatment, lack of stable housing, inconsistent visits by mother and concerning behavior by father at visits. The court found that father had demonstrated emotional support and affection, though it did not conclude that he played a constructive role in the children's lives. It questioned whether mother was capable of playing a constructive role given her choice of gifts to A.B. The court concluded that the factors weighed in favor of terminating parental rights and granted the petitions. Both parents appealed.

When termination of parental rights is sought after initial disposition, the court must first consider whether there has been a change in circumstances sufficient to justify modification of the existing disposition order. In re S.W., 2003 VT 90, ¶ 4, 176 Vt. 517; 33 V.S.A. § 5113(b). If it answers that question in the affirmative, it must then determine whether termination is in the children's best interests. In re S.W., 2003 VT 90, ¶ 4. In assessing the children's best interests, the court must consider the four factors set forth in 33 V.S.A. § 5114(a). "The most important factor for the court to consider is the likelihood that the parent will be able to resume parental duties within a reasonable time." In re J.B., 167 Vt. 637, 639 (1998) (mem.). "As long as the court applied the proper standard, we will not disturb its findings unless they are clearly erroneous, and we will affirm its conclusions if they are supported by the findings." In re N.L., 2019 VT 10, ¶ 9, 209 Vt. 450.

On appeal, father argues that the court erred in concluding that termination of his rights was in the best interests of E.H. and S.H. because the evidence showed that he had ably cared for them for most of their life before the pandemic interrupted their schooling, and he had followed the case plan recommendations, attended all visits, and was working hard to find housing. Father's arguments are unavailing. There is little to no evidence regarding father's care of the girls prior to the initiation of the CHINS petition, though the court acknowledged that father had a loving bond with the children and found that he had taken some of the steps required by the case plan, including consistently visiting with the children. However, the court found that father was unable to resume full-time care for the children within a reasonable time because he did not have stable housing, it was unclear whether his substance abuse issues were under control, and he had not addressed his mental health needs. The court found that this outweighed the loving parental bond between father and the children. The court's findings are supported by the record and support the court's conclusion that termination was in the children's best interests. See In re M.B., 162 Vt. 229, 238 (1994) (explaining that Vermont law "does not dictate that the parent-child bond be maintained regardless of the cost to the child," and noting that inability to provide stable home is "proper, if not critical, inquiry in the decision to terminate parental rights").

Father also appears to challenge the court's finding that he had tested positive for illicit drugs during the case. While father testified that he had never tested positive for an unprescribed

3

substance, this testimony was contradicted by that of the DCF worker, who stated that father had multiple positive tests for amphetamines for which he did not have a prescription. The latter evidence supports the court's finding and we therefore will not disturb it on appeal. In re D.S., 2014 VT 38, ¶ 22, 196 Vt. 325 ("We leave it to the sound discretion of the family court to determine the credibility of the witnesses and to weigh the evidence." (quotation omitted)).

We turn to mother's arguments on appeal. Mother first argues that the court failed to consider that the children's poor school attendance was due to the global coronavirus pandemic. However, she does not explain how this is relevant to the termination decision. Although the children's school attendance was the precipitating factor that led to the children entering custody, DCF identified numerous other underlying issues, including parents' substance abuse and mental health needs, that had contributed to the problem and needed to be addressed. The court's termination decision was not based on the children's pre-petition truancy, but on mother's failure to make progress in addressing these other issues during the pendency of the case.

Mother also argues that the court erred in relying on her few positive test results for illicit substances because there was insufficient evidence connecting those findings to her progress in substance abuse treatment or her parenting. Mother argues that she testified that she had not taken unprescribed medications during the pendency of the case and had a long record of clean urinalysis results. The trial court evidently did not find mother to be entirely credible on this point, and we will not second-guess its credibility assessment on appeal. See In re S.B., 174 Vt. 427, 429 (2002) (mem.) (explaining that this Court's "role is not to second-guess the family court or to reweigh the evidence, but rather to determine whether the court abused its discretion" in terminating parental rights).

Moreover, there was ample other evidence to support the court's determination that mother had stagnated in her progress toward reunification. Mother refused to cooperate with DCF throughout the case. She failed to appear for meetings and, when she did appear, became escalated, which made it difficult to have a productive conversation with staff. She declined to provide urinalysis samples requested by DCF, making it difficult for DCF to assess her substance use. She never completed a mental health evaluation as required by the case plan. She and father were evicted from their home in August 2021 and she had not found adequate housing. Her attendance at visits with the children was inconsistent, including a period in the summer of 2022 when she did not attend visits for a month, and she had not progressed beyond supervised visits. This evidence supported the court's determination that mother had stagnated in her progress toward reunification.

Finally, mother argues that termination of her rights was not necessary to protect the safety of the children because they were in a stable foster home, and therefore she should have been given more time to work on the case plan. "We have repeatedly rejected the claim, however, that the court must consider less drastic alternatives to termination once it has determined the parent to be unfit and unable to resume his or her parental responsibilities." In re G.F., 2007 VT 11, ¶ 20, 181 Vt. 593. Given that at the time of the hearing, mother had made very little progress toward addressing the factors that led to the children entering state custody, the court did not abuse its discretion by choosing termination as a disposition option. The court found that mother was unlikely to be able to resume her parental role within a reasonable time, and did not find that she played a constructive role in the children's lives. These findings are

supported by the evidence and in turn support the court's conclusion that termination was in the children's best interests.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice


_____
William D. Cohen, Associate Justice


_____
Nancy J. Waples, Associate Justice