VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org

Case No.     24-AP-310



*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

FEBRUARY TERM,   2025

| | |
|---|---|
| In re Y.R., Juvenile<br>(S.S., Father\* & K.S., Mother\*) | APPEALED FROM:<br><br>Superior Court, Addison Unit,<br>Family Division<br>CASE NO. 23-JV-01481<br>Trial Judges: David R. Fenster (merits order);<br>Robert W. Katims (disposition order) |

In the above-entitled cause, the Clerk will enter:

Parents appeal the family division's March 2024 order adjudicating their daughter Y.R. a child in need of care or supervision (CHINS) and October 2024 disposition order transferring legal custody of Y.R. to an aunt under a permanent guardianship.  We affirm the merits order and reverse and remand the disposition order.

### I.  Background

In November 2023, the State filed a petition seeking a determination that twelve-year-old Y.R. was CHINS because parents' failure to secure appropriate medical treatment after she became seriously ill placed her at risk of harm.

The supporting affidavit included the following allegations.  Mother, father, Y.R., and Y.R.'s sibling moved into a Vergennes shelter at the end of October 2023.  In the days that followed, shelter staff noticed that Y.R. was unwell.  They became increasingly concerned as her condition appeared to decline, observing that she seemed to be in pain and was no longer able to walk.  Father refused their offers of medical assistance.  He explained that his family was part of the Twelve Tribes Spiritual Community, and he was reluctant to seek traditional medical care for Y.R. because it was not common practice within their religion.  On November 6, shelter staff called 911 after witnessing Y.R. collapse in a common area.  Law-enforcement officers and emergency medical technicians (EMTs) arrived at the shelter and told father that they felt Y.R. needed to go to the hospital.  Father responded that he would prefer to first attempt to treat Y.R.'s condition with naturopathic remedies.  He ultimately allowed EMTs to transport Y.R. to the hospital by ambulance, but only after extensive discussion.

The family division transferred custody of Y.R. to the Department for Children and Families (DCF) under emergency- and temporary-care orders.  After Y.R. was discharged from

the hospital and completed a stay at a residential rehabilitation program, DCF placed her in the home of a paternal aunt in Michigan. In January 2024, DCF filed an initial case plan with a goal of reunifying Y.R. with mother and father.

A contested hearing on the merits of the State's petition was held over two days in February and March. Counsel was appointed for each parent, but father chose to represent himself. The family division heard testimony from the shelter's program director, a shelter employee, an EMT and two police officers who responded to the shelter's 911 call, a DCF investigator assigned to the case, and both parents. It also admitted footage from the shelter's security cameras and an officer's body-worn camera.

The court set forth the following findings on the record and in a subsequent written order. Between October 26 and November 6, 2023, Y.R.'s health deteriorated rapidly and significantly. She demonstrated concerning symptoms including collapse, an inability to walk, and incontinence. Parents discussed bringing her to the hospital if her health did not improve, but had no concrete plans to do so. However, there was no evidence that parents fully appreciated the significance of Y.R.'s condition until she was evaluated by the EMTs on November 6. They did not act unreasonably in attempting to treat her on their own prior to that time.

However, after evaluating Y.R., the EMTs told father and mother that she was in immediate need of advanced medical care, and that the cluster of symptoms they had observed— including unequal pupil sizes and poor perfusion of blood in her skin—indicated that she could be at risk of death. Mother agreed that Y.R. could be taken to the hospital by ambulance, but father initially refused to allow this. He argued with an EMT. Though father did not oppose Y.R. going to the hospital in principle, he insisted that he first be given an opportunity to attempt to address Y.R.'s condition on his own. Father believed that Y.R. had a urinary tract infection and wanted to try treating her with cranberry and garlic. He failed to recognize her urgent need for immediate medical care. Father acquiesced to Y.R. being transported to the hospital in an ambulance only after law enforcement informed him that they had legal authority to do so without his consent. His resistance delayed her departure for thirty to forty minutes. There was no evidence that parents ever would have taken Y.R. to the hospital had others not interceded. Based on these findings, the family division concluded that Y.R. was CHINS at the time of the State's petition.

After the merits order issued in March 2024, father requested counsel and the family division reappointed his previous attorney. Parents agreed with the proposed disposition case-plan goal of reunification but objected to several other aspects of the plan. At a May 2024 disposition hearing, the parties agreed that DCF would file an amended plan incorporating certain changes agreed to among the parties. DCF filed the amended case plan shortly thereafter.

Y.R. then filed an objection to the plan. Her attorney indicated that both parents now wished to change the case-plan goal from reunification to a permanent guardianship with Y.R.'s aunt in Michigan. See 33 V.S.A. § 5318(a)(6) ("At disposition, the court shall make such orders related to legal custody for a child who has been found to be [CHINS] as the court determines are in the best interests of the child, including . . . [a]n order of permanent guardianship pursuant to 14 V.S.A. § 2664."). Mother, father, DCF, and Y.R.'s guardian ad litem all agreed with the requested relief. DCF filed an amended case plan reflecting a new goal of permanent guardianship with aunt.

Another disposition hearing was held on August 6, 2024. Y.R. moved for an order appointing aunt as her permanent guardian. The family division heard testimony from aunt, the

DCF worker assigned to Y.R.'s case, mother, and father. Aunt and the DCF worker both discussed pending arrangements for aunt to receive a subsidy in connection with the proposed guardianship. In a colloquy with Y.R.'s attorney, parents each testified that they understood the obligations and rights attendant to a permanent guardianship. Both agreed that it was in Y.R.'s best interests to be placed with aunt under a permanent guardianship and indicated that they understood that they could not seek to terminate the guardianship if ordered by the court.

On this basis, the court found by clear and convincing evidence that each of the criteria for establishing permanent guardianship were met. See 14 V.S.A. § 2664(a) (listing four findings court must make before establishing permanent guardianship at disposition hearing). It also found that parents consented to the guardianship and demonstrated an understanding of the implications and obligations of that consent. See id. § 2664(b) ("The parent voluntarily may consent to the permanent guardianship, and shall demonstrate an understanding of the implications and obligations of the consent."). The family division issued disposition and permanent-guardianship orders based on the parties' stipulation, DCF's case plans, and the evidence presented at the August 6 disposition hearing. It then transferred the case to the probate division.

On August 13, with the agreement of all parties, Y.R. filed a Rule 60(b) motion for relief from judgment on grounds of mistake. See V.R.F.P. 2(a) (making Civil Rule 60(b) applicable in juvenile proceedings); V.R.C.P. 60(b)(1) (providing that court may relieve party from judgment on grounds of mistake). She indicated that while the DCF worker had testified that aunt could be granted a stipend after the establishment of the permanent guardianship, the agency subsequently discovered that this was incorrect—the subsidy could be approved only prior to the creation of a guardianship. Y.R. also noted that DCF had not yet obtained Michigan's approval, under the Interstate Compact on the Placement of Children (ICPC), to change her placement with aunt from a foster home to a permanent guardianship. On these grounds, she requested that the family division resume jurisdiction over the case, relieve the parties from the disposition and guardianship orders, and afford sufficient time to arrange for the stipend and satisfy the ICPC requirements before reentering the disposition and guardianship orders.

The probate division transferred the case back to the family division at Y.R.'s request. On August 20, the family division issued an order granting the stipulated Rule 60(b) motion, vacating the disposition and permanent-guardianship orders, and reinstating the orders issued prior to disposition.

At the end of September, Y.R. filed a motion indicating that the stipend and placement-approval issues had been resolved and requesting that the court reissue the permanent-guardianship order without further hearing. She indicated that all parties stipulated to the motion.

The following day, however, father filed an opposition to Y.R.'s motion. He stated that he no longer believed that a permanent guardianship with aunt was in Y.R.'s best interests and sought her immediate return to parents' care. In response, Y.R. filed a memorandum arguing that father's voluntary consent to the guardianship could not be revoked as a matter of law.

The parties appeared for a status conference later that day, October 1, 2024. Through counsel, father argued that because the guardianship and disposition orders had been vacated and he now opposed guardianship, the orders could not be reissued without a contested hearing. The court responded by observing that Y.R.'s position was slightly different: she contended that although the guardianship order had been vacated, parents' consent to the guardianship had not

3

been vacated and should stand. The court explained that to determine whether a contested disposition hearing was necessary or if it should instead reissue its August orders without further hearing, it needed to first decide whether—as Y.R. argued—parents' consent to the guardianship remained in place. It afforded the parties two weeks to file supplemental memoranda of law on this issue.

During this status conference, father indicated that he wished to submit several considerations to the court and, although he did not wish to dismiss his attorney, would do so if it was necessary to be heard. After some conversation, the court indicated that if father wished to represent himself, he could file a notice of pro se appearance after the conference and then make independent submissions to the court. It reminded father that if he chose to represent himself and wished to make legal argument regarding the consent issue, he would be responsible for filing a memorandum of law before the October 15 deadline.

Father did not file a notice of pro se appearance. Neither mother nor father filed a memorandum of law. Y.R. filed a supplemental memorandum in further support of her position, and the State joined her arguments.

On October 25, the family division reissued its disposition and permanent-guardianship orders without further analysis. Like the August orders, they were expressly based on the stipulation of the parties, DCF's case plans, and the evidence presented at the August 6 disposition hearing, and parents' consent. This appeal followed.

## II. Discussion

Father and mother raise substantially identical challenges to the family division's merits and disposition orders. We consider each in turn.

### A. Merits

At the merits hearing, the State had the burden of proving by a preponderance of the evidence that at the time of its petition, Y.R. was "without proper parental care or subsistence, education, medical, or other care necessary for . . . her well-being." 33 V.S.A. § 5102(3)(B); see In re A.O., 2023 VT 54, ¶ 9. On appeal, we will uphold the trial court's factual findings unless clearly erroneous and will not disturb its legal conclusions if supported by those findings. In re M.M., 2015 VT 122, ¶ 12, 200 Vt. 540 (explaining that it is not our role "to second-guess the family court or to reweigh the evidence" (quotation omitted)).

As discussed above, the family division found that although mother agreed with the EMTs' assessment that Y.R. should be taken to the hospital immediately, father initially refused to allow this, failing to recognize Y.R.'s immediate need for medical care. His resistance delayed Y.R.'s departure for approximately thirty to forty minutes, and was only overcome when police told him that they had legal authority to take Y.R. to the hospital regardless of his consent.

Parents first argue that neither the evidence nor the court's findings support the conclusion that Y.R. was CHINS. In their view, the delay in Y.R.'s departure for the hospital cannot be attributed to father. This is so, they contend, because the EMTs and police knew that they could leave immediately based on mother's agreement alone, but instead chose to engage with father over an additional period in an effort to secure his consent.

4

The finding that father's actions delayed Y.R.'s departure is supported by the record. See In re M.K., 2015 VT 8, ¶ 8, 198 Vt. 233 ("Only those findings that are bereft of evidentiary support are clearly erroneous."). Parents assert that the EMTs and police knew that they could transport Y.R. immediately, pointing to the EMT's testimony that "we had medical directions [sic] permission to take her with just the mother's consent, regardless of whether or not we had his permission or not, because both parents were present." However, this statement does not establish how much time elapsed between mother's agreement and the EMTs' ultimate determination that they could transport Y.R. on that basis alone. The same EMT also testified that when he and his colleague told father that Y.R. "desperately needed to go to the hospital," father responded that "mother was not capable of making medical decisions for [Y.R.], and that he was the only one that made medical decisions." In any event, the court expressly found—based on the body-camera footage father himself introduced—that "forty-three minutes into the interaction with law enforcement and the EMTs," the two EMTs were "talking to each other about whether or not they have authority to take [Y.R.] to the hospital anyway, even without father's agreement." The court's finding that the delay was attributable to father is not clearly erroneous, and we will not disturb it on appeal.

This finding, in turn, supported the court's conclusion that Y.R. was CHINS. "The focus of a CHINS proceeding is the welfare of the child." See In re A.O., 2023 VT 54, ¶ 9 (alteration and quotation omitted). As a result, the court may adjudicate a child CHINS even if the allegations in the State's petition "are established as to one parent but not the other." In re B.R., 2014 VT 37, ¶ 15, 196 Vt. 304 (quotation omitted). The ultimate question for the court was "whether, given all of the circumstances," Y.R. was without proper parental care such that her well-being was threatened. See In re G.C., 170 Vt. 329, 334 (2000).

Under this analysis, the court did not err in declining to focus on mother's agreement to Y.R.'s hospitalization and any impact it could or should have had on the EMTs' decisions. Nor was it required to consider, as mother suggests, the evidence about her efforts to care for Y.R. before and during her hospitalization. The court's finding that the effect of father's conduct was to delay Y.R.'s departure for the hospital at a time when he should have recognized that immediate advanced medical care was critical to her wellbeing was sufficient to support the conclusion that Y.R. was CHINS. See In re D.D., 2013 VT 79, ¶¶ 36-37, 194 Vt. 508 (affirming conclusion that CHINS because he was without proper medical care necessary for his wellbeing where parents failed to follow through on treatment required for child's serious kidney disorder), superseded on independent grounds by 33 V.S.A. § 5315(g); see also In re B.R., 2014 VT 37, ¶¶ 16-23 (surveying cases and noting that we have upheld merits adjudication "where only one parent was culpable and the other was blameless").

In the alternative, parents contend that the court erred in concluding that Y.R. was CHINS because father was legitimately practicing his religious beliefs in determining what type of medical treatment should be provided to his child. They argue that 33 V.S.A. § 4912(6)(B) establishes a "religious belief defense to a CHINS allegation" consistent with father's constitutional right to religious freedom.[*]

---

[*] Though we do not reach this issue given our conclusion regarding preservation, we note that § 4912(6)(B) defines the term "harm" as it is used in a separate subchapter of Title 33 pertaining to the child-protection registry. 33 V.S.A. § 4912 (defining terms "[a]s used in this subchapter"); see id. §§ 4911-4923. As mother observes, we held in In re M.K. that the definition of "abused or neglected child" in § 4912(1) "can provide some guidance in

At the merits hearing, the parties presented evidence about the family's religious beliefs and the impact those beliefs might have on decisions about when and how to seek traditional medical care for Y.R. However, neither parent raised the argument they now seek to advance on appeal. To properly preserve an issue for appeal—even one of constitutional magnitude—a parent must raise it below "with specificity and clarity in a manner which gives the trial court a fair opportunity to rule on it." In re A.M., 2015 VT 109, ¶ 28, 200 Vt. 189 (quotation omitted); see In re G.F., 2007 VT 11, ¶ 23, 181 Vt. 593 (mem.) (declining to address constitutional arguments not raised in trial court). Parents failed to preserve this issue, and they do not seek plain-error review. See In re G.S., 153 Vt. 651, 651 (1990) (mem.) (noting that plain-error arguments may be considered without preservation). As a result, we do not consider this argument.

## B. Disposition

Finally, parents contend that the family division's October disposition and permanent-guardianship orders must be reversed because the court erred in failing to hold a contested disposition hearing. They argue that, in vacating the August orders, the court necessarily returned the case to its predisposition posture and—given father's intervening change in position—no disposition order could issue without a hearing because 33 V.S.A. § 5317(b) provides that "[i]f disposition is contested, all parties shall have the right to present evidence and examine witnesses." They contend that their prior consent was not dispositive of whether disposition was "contested" such that a hearing was required under § 5317(b).

On appeal from a disposition order, we will uphold the family division's conclusions of law where reasonably supported by its findings. In re K.F., 2004 VT 40, ¶ 8, 176 Vt. 636 (mem). In this case, however, we cannot discern what conclusions the court reached. It never addressed

---

determining what conduct amounts to abuse sufficient to find a child in need of care or supervision." 2015 VT 8, ¶ 12, 198 Vt. 233. However, In re M.K. involved a CHINS determination under § 5102(3)(A), which calls for the court to consider whether a child "has been abandoned or abused by the child's parent, guardian, or custodian" but does not define "abused." In that context, we found it appropriate to consider the definition of abuse set forth in § 4912(1), though we rejected the parent's request that we adopt it for purposes of juvenile proceedings given that " 'the statutes governing the registry process[] found in chapter 49 . . . have legislative goals, functions, and procedures completely different from those governing juvenile proceedings in family court.' " Id. ¶ 11 (quoting In re M.E., 2010 VT 105, ¶ 13, 189 Vt. 114). In contrast, Y.R. was found to be CHINS under 33 V.S.A. § 5103(3)(B), i.e., "without proper parental care." Parents do not explain how § 4912(6)(B) could conceivably offer any guidance in a § 5103(3)(B) analysis given that the provision they cite expressly provides:

> Notwithstanding that a child might be found to be without proper parental care under chapters 51 and 53 of this title, a parent or other person responsible for a child's care legitimately practicing his or her religious beliefs who thereby does not provide specified medical treatment for a child shall not be considered neglectful for that reason alone.

33 V.S.A. § 4912(6)(B) (emphasis added). Rather, parents entirely omitted this "notwithstanding" clause when quoting this provision in their briefs.

the legal argument father raised in his motion and at the October status conference, instead simply issuing its October 2024 disposition and permanent-guardianship orders in substantially the same form as the August 2024 orders it vacated. Nor can we infer an answer to this question from the court's finding that parents consented to the permanent guardianship because this does not amount to a conclusion that disposition was not "contested" within the meaning of § 5317(b).

We decline to take up this issue for the first time on appeal. Accordingly, we reverse and remand for the trial court to supply an analysis in support of its disposition order.

The merits order is affirmed. The disposition order is reversed and remanded.

BY THE COURT:

Harold E. Eaton, Jr., Associate Justice

Karen R. Carroll, Associate Justice

Nancy J. Waples, Associate Justice

7