VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org



Case No.    25-AP-149

*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant. Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

OCTOBER TERM,   2025

In re A.S., W.S., A.S., M.S., and A.S.,
Juveniles (A.S., Father*)

} APPEALED FROM:
}
} Superior Court, Chittenden Unit;
} Family Division
}
} CASE NOS. 22-JV-01477; 22-JV-01478;
}          22-JV-01479; 22-JV-01480;
           22-JV-01481
Trial Judge: Kate Gallagher

In the above-entitled cause, the Clerk will enter:

Father appeals the termination of his parental rights to minor children Am.S., W.S., As.S., M.S., and An.S.[1]  We affirm.

Mother and father have five children: Am.S., born in December 2013; W.S., born in June 2017; As.S., born in November 2018; M.S., born in January 2020; and An.S., born in September 2021.  In October 2022, the State filed petitions alleging that the children were in need of care or supervision (CHINS).  The petitions alleged that mother, who had legal custody of the children, had recently admitted to using cocaine; father was incarcerated for violating parole; the children's maternal grandmother used illicit substances in the home while caring for the children; and mother had placed the children in the care of their paternal grandmother but had not made any legal arrangements for them.

At the temporary-care hearing, the court issued a conditional custody order to mother, which was vacated after mother violated the conditions.  The court transferred custody to the Department for Children and Families (DCF) in November 2022.

Following a contested hearing, in January 2023 the court found that the merits of the CHINS petitions had been established.  The court issued a disposition order in March 2023 that continued DCF custody and adopted a permanency goal of reunification with either parent within six-to-nine months.  The case plan called for father to complete substance-use and mental-health assessments and follow all treatment recommendations; complete a DCF-approved parenting class; abide by all criminal conditions; cooperate with DCF and sign requested releases of information; and complete the "Breaking Free" substance-abuse-and-wellness program while

---

[1]  Mother's parental rights were terminated in the same order, but she did not appeal.

incarcerated. The case plan acknowledged that father was incarcerated and would have to complete many of the action steps after being released.

In May 2024, the children's attorney moved to terminate mother's and father's parental rights. The court conducted a two-day hearing on the petitions in March 2025. In its final order, the court made the following findings.

Father was incarcerated from September 2022 to October 2023. While in custody and for some time afterward, father engaged with DCF. He stayed in phone and video contact with the children, who enjoyed spending time with him. Upon his release, he stayed at Dismas House. He sought medication-assisted treatment and met with a counselor. He also applied for a family unification voucher. However, he soon left Dismas House and began couch surfing or staying with his ex-girlfriend, which made him ineligible for a family unification voucher.

In December 2023, father renewed his relationship with mother. DCF expressed to father its concern that reengaging with mother would interfere with father's sobriety. Within a month, father stopped cooperating with DCF, missed probation meetings, and did not attend scheduled court hearings.

In April 2024, DCF provided father with a list of the action steps required before reunification could occur. Father underwent a substance-use assessment in May 2024. However, he refused to undergo urine tests when asked by DCF and DCF could not get information from his medication-assisted treatment provider.

In June 2024, father was charged with kidnapping and first-degree aggravated assault with a weapon following an incident involving mother and father's ex-girlfriend.[2] Because he was on furlough, father was reincarcerated and required to complete his maximum sentence, which concluded in August 2024.

During his second incarceration, father reengaged with DCF and indicated that he wanted to reunify with the children. He attended some classes and signed releases for DCF to obtain information. He acknowledged that he had relapsed when he was with mother. He had consistent phone contact with the children.

After father was released in August 2024, however, DCF lost contact with him. DCF eventually learned that in October 2024, father was charged with aggravated operation without owner's consent, unlawful trespass, driving with a license suspended for DUI, and violation of conditions of release after an incident involving mother that occurred at the library in Burlington. Father later was charged with federal offenses including possession of a firearm. At the time of the March 2025 termination hearing, he was incarcerated in New Hampshire in connection with the federal charges. He expected to be released in approximately six months. He had attempted to have contact with the children but it was difficult for him to do so in the facility where he was incarcerated.

All five children were initially placed with their paternal aunt, but she was unable to care for them on a long-term basis. The two older children, Am.S. and W.S., were placed with mother's sister in Bennington. Am.S. and W.S. loved their aunt and uncle and were strongly

---

[2] The trial court's order states that this occurred in June 2023, but court records indicate that the charges were filed in June 2024. This apparent factual error has no impact on the court's analysis or the outcome of the case.

bonded with them and their son. The aunt and uncle ensured that Am.S. and W.S. had appropriate medical and dental care and that they stayed connected with their younger siblings and father. Am.S. was doing well in school and making friends. W.S. struggled with learning and had an individualized education plan, but made friends easily and enjoyed school.

The three younger children, As.S., M.S., and An.S., were placed with their paternal grandmother. DCF was unable to license her as a foster parent, however, so they were placed instead with their paternal great-grandmother. Paternal grandmother continued to provide significant support for the children and they generally were doing well in this placement. As.S. appeared to have hearing problems, and both As.S. and M.S. had speech delays. The children were receiving speech and language pathology services and their speech was improving. An.S. had difficulty regulating his behavior and was often disruptive and aggressive at daycare and at home. It was unclear if paternal great-grandmother could be a permanent placement for the three younger children because she lived in senior housing.

Based on the above findings, the court found that father had stagnated in his progress toward reunification. Although he had maintained contact with the children and taken some steps in the case plan, he had not been able to maintain sobriety or refrain from engaging in criminal behavior when living in the community. As a result, he had been separated from the children most of the time since September 2022 and had played little role in parenting them.

Turning to the statutory best-interests factors in 33 V.S.A. § 5114(a), the court found that father had forged a relationship with the children prior to his incarceration and the older children loved him. However, he had not been a stable presence in their lives. The older children did not want to participate in calls and visits with him anymore because they had little to discuss. It was unclear if the younger children had any attachment to father. The children were attached to their current foster parents. The two older children were thriving in the care of their aunt and uncle and were doing well in their school. The younger children were doing reasonably well and their foster parents attended to their needs. As to the third factor, the court found that father faced a potential sentence of life imprisonment on the kidnapping charge, and up to twenty-five years on the aggravated-assault charge. Even if released in six months as he expected, he would need to obtain stable housing and employment, refrain from criminal behavior, and achieve sobriety, and he had not been able to do this in the past. The court found that father would not be able to resume parenting within a reasonable time. Finally, the court found that father was unable to play a constructive role in the children's lives due to his substance use and incarcerations, which made him emotionally and physically unavailable to them. The court therefore concluded that termination was in the children's best interests.

On appeal, father argues that the court erred in terminating his parental rights because the evidence showed that he had a strong bond with the children, acted as their primary caregiver in the past, and would be able to parent them within a reasonable time once released from prison.

When considering a petition to terminate parental rights after initial disposition, the family court must first determine whether there has been a change in circumstances sufficient to justify modification of the original disposition order. In re B.W., 162 Vt. 287, 291 (1994). "A change in circumstances is most often found when the parent's ability to care properly for the child has either stagnated or deteriorated over the passage of time." In re H.A., 153 Vt. 504, 515 (1990). If it finds a change in circumstances, the court must then consider whether termination is in the child's best interests in accordance with the factors set forth in 33 V.S.A. § 5114(a). "The most important factor for the court to consider is the likelihood that the parent will be able to

resume parental duties within a reasonable time." In re J.B., 167 Vt. 637, 639 (1998) (mem.). "As long as the court applied the proper standard, we will not disturb its findings unless they are clearly erroneous, and we will affirm its conclusions if they are supported by the findings." In re N.L., 2019 VT 10, ¶ 9, 209 Vt. 450.

The court applied the correct standard in this case and its conclusion is supported by its findings of fact, which father does not challenge. Even if, as father asserted at the hearing, he was the primary caregiver for the children in September 2022, the court found that he had not provided any day-to-day care for the children since that time due to his repeated incarcerations and substance use. Father was in prison at the time of the final hearing and faced serious federal and state criminal charges. The court found that even if he were released within six months, it would take additional time for him to take the steps needed to provide a safe and stable home for the children. The court reasonably inferred from father's previous conduct that he was unlikely to be able to resume a parental role within a reasonable time. See In re N.L., 2019 VT 10, ¶ 9 (explaining that although analysis of third best-interests factor "is forward-looking in the sense that the court must consider the parent's prospective ability to parent the child, past events are relevant in this analysis" (quotation omitted)).

Father argues that the court should have given greater weight to his bond with the children. As we have previously explained, however, "[p]ublic policy . . . does not dictate that the parent-child bond be maintained regardless of the cost to the child; [the CHINS statute] recognizes that severance of that bond may be in the child's best interest." In re M.B., 162 Vt. 229, 238 (1994). Father also argues that termination was unnecessary because he would be released in six months and the three youngest children's permanent placement was uncertain. Father's argument fails because "a valid termination of parental rights does not depend on the availability of permanent foster care or adoption." In re S.B., 174 Vt. 427, 430 (2002) (mem.) (quotation omitted). Thus, we have "rejected the claim . . . that the court must consider less drastic alternatives to termination once it has determined the parent to be unfit and unable to resume his or her parental responsibilities." In re G.F., 2007 VT 11, ¶ 20, 181 Vt. 593 (mem.); see also 14 V.S.A. § 2660(b) ("The Family Division of the Superior Court is not required to address and rule out each of the other potential disposition options once it has concluded that termination of parental rights is in a child's best interests."). The court was not required to delay permanency indefinitely where it concluded that the best-interests factors weighed in favor of termination.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice


_____
Harold E. Eaton, Jr., Associate Justice


_____
William D. Cohen, Associate Justice